**W. L. GORE & ASSOCIATES, INC.,**
**Plaintiff,**

v.

**CARLISLE CORPORATION, Defendant.**
**Civ. A. No. 4160.**

United States District Court,
D. Delaware.
Sept. 9, 1974.

C. Walter Mortenson of Mortenson & Weigel, Wilmington, Del., Marcus B. Finnegan, and Brian G. Brunsvold of Finnegan, Henderson, Farabow & Garrett, Washington, D. C., of counsel, for plaintiff.

William Poole of Potter Anderson & Corroon, Wilmington, Del., James G. Bernheim, Thomas F. Tivnan and Harriet M. Woodard of Parker, Duryee, Zunino, Malone & Carter, and Henry W. Foulds, Jr., New York City, of counsel, for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This is a patent suit arising under the provisions of Title 35 U.S.C. §§ 271 and 281–285. The patents in suit are United States Patent Numbers 3,082,292 (cited as PX 15), sometimes referred to as the Multi-tet Patent, Robert Gore patent or the 292 patent, and 3,540,956 (cited as PX 34), sometimes referred to herein as the Precise Conductor Patent or the 956 patent.

The plaintiff seeks an injunction permanently enjoining defendant from infringing the patents in suit and seeks treble damages from the defendant for willful and deliberate infringement, together with costs and disbursements in this action including reasonable attorneys fees.

The defendant denies infringement, asserts the invalidity of both patents on the basis of the prior art, fraud on the Patent Office in procurement of the 292 patent, and with respect to the 956 patent, sale of the product produced by the claimed process more than one year prior to the filing of the patent application. By amended answer and counterclaim, the defendant also asserts a violation of Sections 1 and 2 of the Sherman Act, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 1, 2, 15 and 26).

The defendant's anti-trust claim is premised upon the alleged attempt by the plaintiff to monopolize the PTFE flat laminated cable portion of the signal transmission market through the use of invalid and fraudulently obtained patents. Defendant also contends that the plaintiff, by use of this lawsuit, and certain behavior in connection with the attempt by the parties to settle has attempted to divide the market, to increase the price artificially and to prevent the defendant from entering the relevant market by refusing to accept other than a royalty so high as to be prohibitive.

The 292 patent was issued to the plaintiff as assignee of the inventor, Robert W. Gore on March 19, 1963, on application Serial No. 686,900 filed in the Patent Office September 30, 1957. Pre-Trial Order, p. 3(d). The 956 patent was issued to the plaintiff as assignee of the inventors, Howard W. Arnold and Wilbert L. Gore on November 17, 1970 and is entitled to the benefit of an October 8, 1965 filing date. Pre-Trial Order, pp. 3, 4(e)(f). The plaintiff from the date of issue has been and re-

mains the owner of said patents. The defendant, Carlisle Corporation, through its Tensolite Wire and Cable Division (hereafter called "Tensolite") is the manufacturer and seller of certain multiconductor cables alleged to infringe both patents. Both parties are Delaware corporations. Jurisdiction of the patent issues is based on 28 U.S.C. § 1338 and venue is founded on 28 U.S.C. § 1400. Jurisdiction of the anti-trust issue is based on 28 U.S.C. § 1337.

Both patents in suit concern the manufacture of flat multi-conductor ribbon cable insulated with polytetrafluoroethylene (PTFE). The cable is used to transmit electrical signals. Both the plaintiff and defendant manufacture such cable by laminating a multiplicity of conductor wires between sheets of extruded, unsintered PTFE, followed by subsequent sintering of these assemblies to yield the final product.

Preliminarily, and by way of explanation, unsintered PTFE sheets are used both by plaintiff and defendant as the starting material for cable manufacture. At the time of the conception of the invention described in the 292 patent, extruded, unsintered sheets of PTFE were the only commercially available forms of unsupported unsintered PTFE sheets and this is true today. (Tr. 115, 153, 1821). The starting material in extruded unsintered PTFE tape manufacture is PTFE dispersion powder which may be purchased from several manufacturers. (Tr. 59). Dispersion powder consists of particles of polymer about 0.1 micron in diameter. (PX 25B). The powder is mixed with a lubricating agent, usually a light hydrocarbon oil, producing a paste-like material which can be ram extruded. The paste is lightly compressed into a pellet shaped so that it may be inserted into the barrel of a ram extruder. The barrel of the ram extruder is tapered to a narrow constriction, which is followed by a spreader die having a wide and thin exit opening. The dimensions of the exit opening are nearly the same as the sheeting to be made. (Tr. 62). During their passage through the constriction in the barrel of the ram extruder the PTFE particles in the paste are sheared and fibers are formed as shown in an electron micrograph of fiber from unsintered extruder lubricated PTFE. (PX 3). The hydrocarbon lubricant which was added prior to extrusion may be removed by passing the tapes through a high temperature oven. (Tr. 67–68). The product formed is an extruded unsintered sheet made up of a mixture of fibrils and unfibrillated particles and is the starting material for the manufacture of the cables disclosed in the 292 and 956 patents. (Tr. 67a).

### The 292 Patent

The plaintiff asserts that the defendant is infringing claims 1–14 and 24–27 of the 292 patent. Claims 1–14 are process claims and 24–27 are product claims. (PX 15).

A representative process claim is Claim 7 which reads as follows:

7. A process for coating, in a continuous manner, an article which process comprises passing along their longitudinal axes at least two surfaces of a coating material derived from an unsintered tetrafluoroethylene polymer and in sheet form to and through the nip of two pressure rolls, the said sheets and said rolls being at temperatures below the sintering temperature of the said polymer; simultaneously passing the article to be coated to and through the resultant nip being formed by the said sheets; exerting pressure on the said coating material to enclose the said article in the said material and to bond the said unsintered sheets together when and where they contact each other under pressure in said passage to form at least one web which has a thickness less than the sum of the initial thicknesses of said sheets, which contains unsintered polymer and which extends longitudinally along the length of the resultant enclosed article and transversely away from it; and withdrawing from the exit side of said rolls the

resultant assembly which comprises the said article having a coating of the said unsintered polymer and at least one web.

The specifications and dependent claims teach that the pressure rolls contain in their surface cut out portions or grooves which correspond to the article to be coated, typically wires. The wires are fed into the grooves in the rolls and the sheets of unsintered PTFE are pressed together around the wires by reason of the pressure exerted on the PTFE. (PX 15, Col. 1, Lines 40–48). The resulting assembly is then passed through an oven to sinter the PTFE. The result is a homogenous assembly consisting of wires separated and encapsulated by the PTFE sheets. (PX 15, Col. 2, Lines 4–11). The coating of PTFE can be made thinner than could be accomplished with other materials. The pressing of the PTFE sheets around the wires results in the thickness of the sheets between the wires being generally less than twice the thickness of the two original PTFE sheets. (PX 15, Col. 2, Lines 25–30).

Prior to sintering, the assembly shows no tendency to separate during handling (PX 15, Col. 2, Lines 55–57), and after sintering the assembly is tightly held together and so tough that it can be flexed and twisted without harm. (PX 15, Col. 2, Lines 59–61).

The inventor of the 292 patent, Robert W. Gore, is now the holder of a Ph.D. degree in chemical engineering. (Tr. 423). At the time the invention was made he was a student at the University of Delaware, enrolled in its Chemical Engineering Department. His father, Wilbert L. Gore was employed in the period 1953–57 by the DuPont Company and worked in an operations research group. (Tr. 83, 84, 90). His job responsibilities included planning the course of research work and commercial development of polymers.

DuPont had encountered problems in processing PTFE and had decided to concentrate its research and development on the perfection and commercial exploitation of fluorocarbon copolymers rather than to continue research and development on the homopolymer PTFE. (Tr. 83–84).

W. L. Gore did not agree with this decision of DuPont and decided to continue on his own the work abandoned by DuPont. In the spring of 1957, Gore was conducting research and development work in the basement of his home using equipment similar to that previously used by Reuben Fields at DuPont in experiments with PTFE granular powder. Instead of using PTFE granular powder as Fields had done Gore was using PTFE dispersion polymer containing a hydrocarbon lubricant. (Tr. 460–461; PX 23, p. 36). Gore's efforts were no more successful than Fields had been and he was not producing an electrically sound cable. (Tr. 85–87, 435–438).

The experimental work by Fields and that of Wilbert Gore involved the feeding of the PTFE powder directly into the calender rolls and then sintering it.

Robert Gore, the son and inventor, asked his father why not take some of the unsintered tape of PTFE and feed the tapes in the nips of the calender rolls, one on each side, and make a wiring strip instead of trying to control the feeding of the powder into the rolls. (Tr. 88). W. L. Gore, being an expert in the characteristics of PTFE, based on his experiences at DuPont, explained that sheets of unsintered PTFE extruded tape could not be made to adhere to each other, and even if they could, upon being subsequently sintered the material would tear itself apart. (Tr. 88, 439–443). Robert Gore insisted it would not hurt to try. His father finally agreed. (Tr. 88–89, 440–441).

Wilbert Gore was surprised that the two pieces of extruded PTFE tape adhered tightly together and that the resulting assembly did not tear itself apart during the process of sintering which required heating well above the PTFE crystalline melt temperature. W.

L. Gore sensed this was an operable process for encapsulating electrical conductors. (Tr. 89). Subsequent dielectric tests of laminated ribbon cable assembly produced the next day by the Robert Gore process proved this process produced an electrically sound cable.

The invention of the 292 patent in essence involves pressing together unsintered, extruded, sheets of PTFE to enclose conductors between the sheets bonding the sheets by the pressure of calender rolls, and then sintering the resulting assembly without applying pressure during the sintering step. This procedure is not suggested by any single item of the prior art nor by any combination of the prior art cited in the prosecution of the patent or any patents or articles presented in evidence by the defendant at trial.

### The Prior Art

Defendants have alleged that the 292 patent is invalid by reason of obviousness under 35 U.S.C. § 103. The pertinent prior art the defendants cite includes an unpatented process for wrapping single conductors with PTFE tape; patents issued to McTighe (DX 32), Abbott (DX 35), Logan (DX 36), Edgar (DX 37), Llewellyn (DX 38), Richards (PX 20) and Thomas (DX 26); and the process used by Fields at DuPont, to which the Court has previously referred.

Prior to the date of the invention of the 292 patent it was known in the art that a single conductor could be spirally wrapped with extruded unsintered PTFE tape to produce tape-wrapped wire. (PX 14; Tr. 82–83). In the tape-wrapping process, a tape of PTFE is spirally overlapped and wound around and around a conductor with the tape held under tension. The assembly is then sintered. The tape tends to retract upon being sintered. The retractable force causes the tape to endeavor to shrink and thus the overlaps are pulled tightly against each other. The pressure exerted as the tape attempts to shrink binds the tape together while it is being fused by sintering. In compari-

son with the Gore process, the tape-wrapping process is quite slow and laborious. Further, the Gore process differs from the tape-wrapping process in that no pressure is applied to the tape in the Gore process during the sintering step. (Tr. 82–83).

The McTighe (DX 32), Abbott (DX 35), and Logan (DX 36) patents were cited by the Patent Office during the prosecution of the 292 patent. (PX 15, PX 22). These patents disclosed that an insulating coating could be applied to a wire conductor by passing the wire conductor, interposed between two sheets of insulating material, through pressure rolls. The material used in the coating in the McTighe patent is lead. In the Logan and Abbott patents the material is rubber or thermoplastic, such as polymer vinyl chloride, polyvinyl acetate or isobutene polymers.

Representative of the prior art wire coating processes using a pair of insulating sheets is the Logan patent. (DX 36). In the Logan process two strips of a semi-vulcanized or partially cured rubber insulating material with wire interposed between them are passed through pressure rolls. The pressure rolls cause the rubber strips to adhere to each other and form around the wire. The resultant assembly is then heated so that the vulcanization or curing of the rubber insulation is completed. The major difference between the claims of the 292 patent and the prior art as represented by the Logan process and similar prior art processes relied on by the defendant is in the use of unsintered extruded sheets of PTFE as the insulating material. Since it is novel and unobvious to bond two unheated sheets of PTFE by pressure and then to free-sinter the resulting assembly, the 292 process is patentably distinct from the processing of the rubber in Logan or the thermoplastics in McTighe and Abbott.

The patent of Edgar (DX 37) while not cited as a reference was nonetheless considered by the Examiner (PX 22, pp. 26, 46) and by the Board of Appeals, when it decided to allow the 292 patent.

(PX 22, p. 131). Edgar teaches a process for producing sheets of PTFE by preparing an aqueous suspension of PTFE and coagulating the PTFE by adding a water soluble organic liquid to the suspension, thus forming soft curds of PTFE which are then dried and fed to unheated or slightly heated pressure rolls. The particles adhere to form a continuous film which may then be spirally wrapped around a single conductor and fused to an integral sheath. (DX 37, Col. 3, Lines 70–74). Edgar does not, however, teach any differentiation between sintered and unsintered PTFE. He therefore does not teach or suggest that unsintered sheets could be laminated without heat to form a coherent structure prior to sintering, nor does he suggest compressing the sheets of extruded unsintered PTFE together to a thickness of less than the sum of the thickness of two sheets prior to sintering.

The patent to Llewellyn (DX 38) discloses a process for making a PTFE packing material useful for forming a fluid-tight seal in valves and pumps. In this process particles of unsintered PTFE are repeatedly passed through milling rolls to form masses of matted shreds or flakes. The wadding so produced is used as valve packing. The process employs no sintering step and, in fact, the shreds are so slippery they cannot be pressed together. (Tr. 554). Thus the similarity of the Llewellyn process to the Gore process is remote.

A great deal of emphasis has been placed on the Richards patent. (PX 20). This patent is concerned with the production of a fiber glass fabric impregnated with PTFE. This product finds use as electrical insulation in electric motors. In the Richards process a fiber glass cloth is dipped directly into an aqueous dispersion of PTFE and then allowed to dry. "Mud cracks", formed during the drying operation appear in the dried impregnant. In order to remove these mud cracks the fabric is rolled between a steel pressure roll and a paper counter roll. (PX 20, Col. 4, Lines 50–54). This is followed by passing two or more impregnated glass fabric sheets through a series of pressure rolls which compacts the plies and causes them to adhere to each other. (PX 20, Col. 4, Lines 16–21). Finally, the assembly is sintered to form a continuous laminated material.

Kurt Richards, the inventor, Wilbert Gore and Reuben Fields all testified at trial that the passing of the impregnated sheets through the calender rolls was essentially a compressive force and not a shearing one. (Tr. 104, 337–338, 537–538, 1070–1071). They also testified that there was nothing in the Richards process that would fibrillate the PTFE powder. Richards testified that there was no buildup of material in front of the rolls, which would indicate there was very little, if any, lateral flow of PTFE, so no fibrillation of the PTFE could occur. (Tr. 1071–1072). This is to be contrasted with the extruded PTFE used in the Gore process, which PTFE becomes highly fibrillated during extrusion.

The essential differences between the Gore and the Richards process is that Richards does not disclose a process using sheets of unsintered, extruded PTFE; instead a fiber glass mat impregnated with dried dispersion PTFE powder is used. In Richards there is very little shearing of the PTFE unlike the 292 patent in which highly sheared unsintered PTFE is used.

It is true that Richards teaches the application of pressure and heat to the encapsulating material in two distinct steps. (PX 20, Col. 2, Lines 47–52). However the Richards patent does not contain any suggestion to one skilled in the art that unsupported tapes of sheared PTFE can be laminated to encapsulate a plurality of conductors, and that the resulting assembly could be free sintered and would be electrically flawless, as is the result in the 292 patent.

In the Fields process, parallel wires are fed into the nip between calender

rolls. PTFE granular powder is fed to the rolls and pressed onto the wires as a preform and then passed through a sintering bath or oven. This process is described in a DuPont brochure. (PX 23). At page 36 and page 40 are described the problems inherent in feeding PTFE powder into the nip of the calender rolls. These problems were encountered first by Fields who used granular powder and later by Gore who used dispersion powder. The problems were first, one had to be very careful to obtain a smooth and equal distribution of the powder because of the limited ability of the powder to flow and secondly, when the preform left the calender rolls it was brittle and easily fractured and could not be bent until it was at least partially sintered. (Tr. 85).

Although a great deal of work was done on the Fields process it was apparently never commercially successful (Tr. 461) since the product was rather porous and the dielectric strength was deficient for any stringent electrical requirement. (Tr. 85-86).

Many experts at DuPont, including Dr. John Lontz, defendant's expert witness, were aware of the need for multi-conductor flat cable and the excellent insulating properties of PTFE. They were also aware of the availability of extruded unsintered PTFE tape and the work being carried on by Fields. Despite this, no one of the highly skilled experts in the art suggested any improvement on the Fields process or attempted to use extruded unsintered PTFE tape to laminate conductors and form a flat, multi-conductor cable even though the material, tools and equipment was available in their laboratories well before 1957. (Tr. 85-87, 1517-1518). This fact suggests that the prior art did not anticipate the Gore invention. In fact, plaintiff contends that the prior art actually made the invention unexpected.

### The DuPont Principle

■ In support of its contention that the claims of the 292 patent are novel and unobvious, plaintiff claims that the invention contravened a principle generally accepted in the art until 1957. This principle, referred to as the DuPont principle, was, as articulated by Wilbert Gore, "that sheared or fibrillated PTFE cannot be formed and free sintered." (Tr. 69, 77, 80-81, 478-479, 539-540; PX 25(f)). Because this principle "teaches away" from the discovery of the 292 patent, the fact that it was generally accepted prior to 1957, if true, would support a determination that the 292 invention was non-obvious. United States v. Adams, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Defendant contends, however, that the purported DuPont principle did not exist or was not widely believed. On the basis of documentary evidence in the record which supported the oral testimony by plaintiff this Court finds that the DuPont principle was accepted in the art prior to 1957. W. L. Gore testified that the empirical basis for the DuPont principle was the observation that fibrillated PTFE that was formed and then sintered without pressure would "pull itself apart" during sintering. (Tr. 80).[1] The description of the properties of calendered PTFE contained in a DuPont Company brochure on Teflon published in 1955 (PX 23, p. 21) is consistent with the concern that the material not be allowed to "flow", or become fibrillated, if an adequate molding were to be achieved. That description stated, "The coating is also free of strains, since the molding powder has not been caused to flow in any step." (Tr. 166-167; PX 23, p. 41).

---

1. More fully, his explanation was: "In all our experience in dealing with fibrillated material, we found that it was necessary in order to form a sound molding to hold the material under compression during the sintering or it would pull itself apart as had these moldings here. This is, I believe, a consequence of the elastic retraction of the fibrils when they are heated above their melting temperature. This elastic retraction just makes them pull themselves apart when one is sintered." (Tr. 80).

More important, a patent issued to two DuPont employees, Paul Elliot Thomas and Curtis Clayton Wallace, Jr., provides evidence that the DuPont principle was accepted in the art prior to 1957.[2] The Thomas and Wallace patent states:

It has also been known to improve the strength of unsintered objects made of polytetrafluorethylene granular powder by preliminarily shearing the powder (see Llewellyn U.S. Patent 2,578,523). Hitherto, however, if sufficient shear stresses have been applied to the powder to improve the strength of preforms molded from it, it has either been impossible to level the product with sufficient uniformity to produce a preform of adequate uniform density in thin sections, or else it has been impossible to cause the sheared powder particles to coalesce to soundly fused articles during the sintering operation. Consequently, it has not hitherto been known to prepare a powder which is readily leveled and preformed, and, at the same time, capable of yielding strong readily handled preforms which, in turn, are capable of being sintered to thin strong tough non-porous sheeting. (DX 26, Col. 1, Line 70 to Col. 2, Line 14).

Simply put, this statement means that until the time of the Thomas and Wallace application, it was considered difficult or impossible to sinter sheared, formed, unsintered PTFE successfully.[3]

The parties differ, however, over whether the DuPont principle was undercut by the teaching of the Thomas and Wallace patent. The invention claimed by that patent is granular PTFE molding powder consisting of particles having certain shape and dimensions. Clearly, the PTFE particles used in the Thomas and Wallace invention are sheared to some extent. (DX 26, Col. 2, Lines 46–48, Col. 4, Lines 11–23). Plaintiff points out, however, that the Thomas and Wallace specification also states that too much shearing will produce an unsatisfactory molding powder. Plaintiff argues (1) that the extruded PTFE material used in its invention is much more fibrillated than that used by Thomas and Wallace, and (2) even if the Thomas and Wallace discovery modified the pre-existing DuPont principle somewhat, it reinforced that principle with respect to more highly fibrillated materials. Defendant on the other hand, contends that the Thomas and Wallace material is at least as fibrillated as plaintiff's unsintered extruded tape and therefore, that plaintiff's discovery was obvious in view of the Thomas and Wallace teaching.

There was much dispute between the parties as to how highly fibrillated plaintiff's extruded unsintered PTFE actually was, whether this PTFE was more or less highly fibrillated than the material used by Thomas and Wallace, and what type of measurements should be used to make such a comparison. This Court, however, does not need to rule on these arguments. The controlling factor here is that Thomas and Wallace warned of adverse consequences if "the shear stresses applied during the preparation stage are too high." (DX 26, Col. 8, Lines 12–13). Even Dr. Lontz, the defendant's expert, agreed that the extrusion procedure used to form the plaintiff's starting material resulted in a "highly sheared" material. (Tr. 1444–1445). Thus the Gore process, using a material which had been highly

---

2. Patent No. 2,936,301 was issued to Thomas and Wallace on May 10, 1960 upon an application filed November 15, 1956. (DX 26).

3. Testifying for the defendant, Dr. Lontz stated that he did not fully subscribe to this statement by Thomas and Wallace and he questioned whether it was generally accepted at DuPont. (Tr. 1503). In light of the facts that Dr. Lontz was personally involved in preparing the specifications and tests for the Thomas and Wallace invention (Tr. 1238) and was the supervisor of Thomas at the time of the patent application (Tr. 1505) but did not voice any contemporaneous objection to the Thomas and Wallace statement, this testimony by Dr. Lontz is entitled to limited weight.

sheared, would probably have been expected, on the basis of the Thomas and Wallace teaching, to be unsuccessful. Clearly, the Gore process cannot be labeled obvious in view of Thomas and Wallace.

Defendant's final contention with respect to the DuPont principle is that nothing in the 292 patent limits its scope to the use of fibrillated PTFE. It is true that the 292 patent specification does not mention fibrillation or shearing and does not teach that paste extrusion (which implies fibrillation) must be used to prepare the PTFE tape used in the invention. However, extrusion is mentioned in the 292 specification. Moreover, the record shows that extruded unsintered PTFE, which is fibrillated, was the only commercially available form of unsintered PTFE unsupported sheets at the time of the 292 invention. (Tr. 115, 158, 1821). Therefore, the fact that shearing and fibrillation are not expressly mentioned in the 292 specification is not deemed here to be a deficiency, nor does it indicate that the DuPont principle was created after the fact by the plaintiff.

### Procurement of the 292 Patent

Defendant claims that the 292 patent is unenforceable because plaintiff is responsible for fraud or inequitable conduct in its procurement. Specifically, defendant contends that the plaintiff either misrepresented or omitted material information about two elements of the prior art—the commercial wire-wrapping process and the Richards patent—during the prosecution of the 292 application. Because this Court has found that the 292 claims are not obvious in view of this prior art, defendant's position must be that it was inequitable for the plaintiff to withhold or misrepresent information about these two patents, even though full disclosure would not properly have prevented granting of the patent. In other words, defendant's position is that measured by "both public and private standards of equity," Precision Co. v. Automotive Co., 324 U.S. 806,

816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945), the deficiencies of Gore's representations to the Patent Office made it "impossible for the Patent Office fairly to assess (the 292 application) against the prevailing statutory criteria." Monsanto Co. v. Rohm & Haas, 456 F.2d 592, 600 (3rd Cir. 1972).

During the course of the 292 prosecution, the Edgar patent was cited as a reference by the Examiner. That patent states in part:

It is within the scope of this invention to use the unfused or partially fused film as a wrapping for either heat or electrical insulation and then fuse the film in situ. For example, wrapping an electrical wire conductor with a 50% overlap on each turn of the fused or unfused film, and then heating between 621° F. and 932° F., will provide a uniform continuous covering for the electrical conductor since the polytetrafluoroethylene film will fuse to an integral sheath. (DX 37, Col. 5, Lines 35–44).

In an effort to eliminate Edgar as a reference, Gore submitted several affidavits to the Patent Office tending to show that this wire-wrapping process would not· work. (PX 22, pp. 50–53, 75–80, 123–124). None of the affidavits informed the Patent Office that there existed a commercial wire-wrapping process for unsintered PTFE film, of which the applicant was well aware, (Tr. 1753–1754, 1898), quite similar to that suggested by Edgar. (Tr. 82–83). Defendant contends that this information was material and that its omission constitutes a breach of the duty of full and fair disclosure.

However, this Court finds that the specification of the 292 patent adequately informed the Examiner and the Board of Appeals of the existence of the commercial tape-wrapping process:

Thin coatings of good electrical quality can be put on electrical conductors by wrapping them with polytetrafluoroethylene tape and then sintering the wrapped tapes together. However,

this is a laborious operation that can be done only at low linear rates along the conductor; only single conductors can be coated by this process; and the coatings are somewhat rough where the spiral wraps overlap. This invention obviates all of these difficulties. (PX 15, Col. 4, Lines 26–34).

There is no reason to assume that this acknowledgment of a commercial PTFE wire-wrapping process was ignored by the Patent Office in its evaluation of the Edgar patent, and this Court finds no misconduct by the plaintiff in this connection.

■ The second omission complained of by the defendant is the failure of the plaintiff to bring the Richards patent to the attention of the Board of Appeals. Although the Richards patent was referred to by number twice during the prosecution before the Examiner, (PX 22, pp. 48, 91), the record indicates that Richards was not considered at all by the Board of Appeals.[4] Given that Richards was a significant, albeit not dispositive element of the prior art, the question is whether the plaintiff had a duty under these facts to make the Board aware of Richards before securing its patent.

■ The Board's failure to consider a relevant reference in this case is attributable more to the nature of Patent Office procedure than to any want of fair dealing by the plaintiff. An amendment submitted by the plaintiff to the Patent Examiner of April 24, 1961 indicates:

The art discussed during the interviews included several patents not listed in the actions, including U.S. 2,731,068 [Richards] and U.S. 2,789,926, the various ones not being

listed, as stated by the Examiner, because those already listed are adequate, and further listing would be over-lapping or repetitious. (PX 22, p. 91).

Thus, the Examiner, in his role as a fact-finder,[5] did not consider Richards a significant reference, and in his "Answer" to the applicant's appeal, understandably did not rely on Richards. However, the Examiner is not truly an adversary of the applicant before the Board of Appeals. Rather, his role is to explain, not to embellish, his rejection of the applicant's claims. 1 Horowitz, Patent Office Rules and Practice, §§ 193–193.2 (1971 ed.). Indeed, in answering appeals to the Board of Appeals, the Examiner is admonished by Commissioner's Order No. 2070 (September 16, 1913) to recite only those references on which he relies to support the actions from which appeal is taken. 1 Horowitz, supra, § 193.2.

Thus, the present Patent Office procedure presents a dilemma not readily susceptible to solution. On the one hand, it seems unduly onerous to require patent applicants, on pain of a finding of fraudulent or inequitable procurement, to rebut on appeal not only the prior art upon which the Examiner relies, but also the prior art considered, but not relied upon by the Examiner. Defendant has cited no authority in support of such a duty. On the other hand, present procedure makes it unlikely that relevant references adverse to the applicant, upon which the Examiner does not choose to rely on appeal, will ever be considered again in the Patent Office appellate process. This dilemma will not likely be resolved until some form of adversary

---

4. According to the testimony of Nathan Marmelstein, the Board of Appeals member who authored the opinion granting the 292 patent, the Board would not, as a matter of practice, examine a patent referred to during the prosecution before the Examiner but not raised on the appeal by either the applicant or the Examiner. (Tr. 1724–1726). Wilbert Gore admitted that the Richards patent was not discussed in the oral argu-

ment before the Board. (Tr. 1774–1776). Moreover, the fact that no reference to Richards appears in the opinion of the Board supports an inference that the patent was not considered by the Board. (Tr. 1299–1300).

5. See 1 Horowitz, Patent Office Rules and Practice § 104 (1971 ed.).

proceeding in the Patent Office is established.

■ In any event, plaintiff's failure to make the Richards reference known to the Board of Appeals does not rise to the level of inequitable conduct. The record indicates that the plaintiff has, in good faith, never considered the Richards patent to be anticipatory. Moreover, Richards was considered and evidently disregarded by the Examiner. Finally, this Court has determined that consideration of Richards by the Board of Appeals would not have compelled a different result. Whether, under a different set of facts, an applicant's failure to recall to the attention of the Patent Office prior art previously considered by an Examiner could amount to inequitable conduct need not now be decided.

### Infringement

■ At trial, plaintiff introduced substantial evidence of infringement of the 292 patent which defendant did not controvert. Plaintiff's expert Reuben Fields inspected Tensolite's manufacturing facility twice and testified as to defendant's accused process and products. Defendant manufactures two principal types of flat laminated PTFE cable. One type of cable has a rectangular cross-section and is produced on an apparatus having smooth (ungrooved) calender rolls. (PX 40, 83; Tr. 481–484).

The other type of cable has a ribbed cross-section and is produced on a similar apparatus having grooved calender rolls. (PX 53; Tr. 499). The manufacture of these two types of cable infringes both process and product claims of the 292 patent.

Process claim 7 is representative of process claims 1–10 of the 292 patent.[6] Fields testified that each and every step and limitation in claim 7 is present and followed in defendant's process for manufacturing rectangular cable. (Tr. 485–489). Defendant's process for producing rectangular or smooth cable liberally infringes claims 1–5 and 7–9. (Tr. 481–490). Defendant's process for producing ribbed cable literally infringes claims 1–9 of the 292 patent. (Tr. 481–490, 499, 521, 679–682). Additionally, process claim 11,[7] which is representative of process claims 11–14, is literally infringed by defendant's manufacturing process for ribbed cable. (PX 53–56; Tr. 499–526, 679–682). Finally, defendant has manufactured and sold PTFE cable having one PTFE sheet of one color and the other sheet of a different color, thereby infringing claim 10. (Tr. 673). In summary, defendant has literally infringed process claims 1–14.

Plaintiff has also proved that defendant has manufactured and sold PTFE ribbed cable that literally infringes product claims 24–27.[8] (PX 55, 80; Tr.

6. Only claims 1 and 7 of the first ten claims are independent claims. Claim 1 is broader in scope than claim 7 and is, therefore, infringed by any process that would infringe claim 7. Claim 7 is quoted at pages 6–7, supra.

7. Claim 11 states: "A process for coating, in a continuous manner, an article which comprises passing along their longitudinal axes at least two surfaces of a coating material derived from an unsintered tetrafluoroethylene polymer and in sheet form to and through the nip of two pressure rolls containing recesses separated by ridges, the said sheets and the said rolls being at temperatures below the sintering temperature of the said polymer; simultaneously passing the article to be coated to and through the resultant nip being formed by the said sheets and aligned to pass through respective recesses; exerting pressure on the said coating mate-

rial to enclose the said article in said material and to press the said sheets together, when and where they contact each other under pressure in said passage over said ridges, to a thickness less than the sum of their initial thicknesses to bond the said sheets together in the form of a web which has the said lesser thickness, which contains unsintered polymer and which extends longitudinally along the length of the resultant enclosed article and transversely away from it; and withdrawing from the exit side of said rolls the resultant assembly which comprises the said article coated with polymer that is unsintered and the said web."

8. Claim 24, upon which claims 25–27 are dependent, reads: "As an article of manufacture, an electrical conductor coated with a tetrafluoroethylene polymer which is in an unsintered form and is bonded by a weld extending longitudinally along the length of

501–515, 683–685). Defendant does not contest the fact that it has sold products literally covered by claims 24–27. Plaintiff is entitled to an injunction prohibiting further infringement by defendant and an accounting of damages for past infringement.

Although there is no question that defendant has infringed the 292 patent, the parties dispute whether Tensolite's infringement has been "wanton, willful, and deliberate" so as to justify an award of increased damages pursuant to 35 U.S.C. § 284.[9] For reasons articulated below, the Court will not at this time decide whether increased damages are appropriate. Since, however, many of the facts relevant to the willfulness of defendant's infringement are already in the record, they will be set forth in this opinion.

Defendant, having been requested by a purchaser to develop "Bill Gore type ribbon cable," agreed to proceed with the development of a PTFE cable product line in August, 1968. (PX 59, 60). In the letter indicating this intention, defendant estimated "we may have something for you in about two months." (PX 60). However, no evidence of any infringing sales prior to 1970 has been introduced thus far. In expressing defendant's intention to produce PTFE cable, defendant's vice president of engineering, John Fay, wrote, "It would be very helpful if you could obtain samples of Gore's products for our analysis. We might even buy them if necessary." (PX 60). Defendant did subsequently analyze samples of plaintiff's cables, although the date of this analysis is uncertain. (Tr. 598). Furthermore, in early 1969 the Tensolite staff analyzed a Gore catalogue to obtain guidance in developing its PTFE cable project. (PX 70, 92; Tr. 632–633, 783–786, 800–801). Thus, defendant's PTFE flat laminated cable research and development program was stimulated by Gore's success in the marketplace, and was advanced by analysis of Gore's products and catalogue specifications.

During the period when defendant was proceeding with its development of the infringing process and products, its officers had reason to know that the Gore technology being duplicated was under patent. George Heller, President of Tensolite and a Vice President of Carlisle Corporation, knew of the existence of a Gore patent application covering flat laminated cable as early as 1958. (Tr. 294). Heller was aware of the progress of defendant's PTFE cable project throughout its development. (Tr. 645). The evidence is contradictory as to when Heller and his staff first learned that a patent had actually issued to plaintiff on its PTFE cable technology. W. L. Gore testified that George Heller approached him about a license under the 292 patent at a meeting of the National Electrical Manufacturers Association in Barbados, which took place in January, 1969. (Tr. 294). George Heller testified at first that he discussed a license with Gore at the Barbados meeting, but after checking his notes, he testified that it was unlikely that any licensing discussion took place until a meeting in Curacao in January, 1970. (Tr. 1094–1095). According to John Fay, the first time defendant actually saw the 292 patent was in early 1970. (Tr. 644–645). Whether the defendant actually learned of plaintiff's 292 patent by January, 1969, as Gore's testimony implies, or by January, 1970, as Heller's and Fay's testimony implies, it is plain that during the course of its PTFE ca-

---

said conductor and transversely away from it, said weld comprising at least two overlapped sheets of said polymer compressed to a thickness less than the sum of the initial thicknesses of the elements in the overlap, the said initial thickness of a sheet being measured by the thickness of the coating derived from the respective sheet."

9. The statute provides in part: "When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed."

ble research and development, defendant had reason to suspect that Gore's products and process were patented. The fact that Heller was told of plaintiff's patent application in 1958 and that defendant's staff was quite familiar with transmission cable market developments convince this Court that only deliberate ignorance could have kept informal, if not detailed, knowledge of the 292 patent from defendant's staff until 1970.[10]

Several months after defendant learned that Gore's products and process were patented, defendant solicited an opinion of patent counsel on the validity of the 292 patent. Evidently, the date defendant first sought legal advice was in November, 1970. (PX 109; Tr. 803–803A). Counsel advised that the 292 patent was invalid in view of the Richards patent. Thus, it was more than two years after defendant began development of PTFE cable that favorable legal advice was obtained.

■ The record may be incomplete, however, on the timing and extent of defendant's infringing sales. It appears that defendant made at least one infringing sale in 1970 before soliciting the advice of patent counsel on the validity of the 292 patent. However, the Court is uncertain whether there were other infringing sales prior to November, 1970. It seems unlikely that defendant, which expected to develop a product "about two months" after August, 1968, waited an additional two years to make use of its technology. The fact that an infringer has acted on the advice of counsel does not preclude a finding of increased liability for dam-

ages, Hartford National Bank and Trust Co. v. E. F. Drew & Co., 188 F.Supp. 353, 361 n. 41 (D.Del.1960), aff'd, 290 F.2d 589 (3rd Cir. 1961), cert. den. 368 U.S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961), however, it may be relevant. The extent to which defendant went beyond mere research and development of flat laminated PTFE multiconductor cable prior to obtaining the advice of counsel may be helpful in determining the propriety of increased damages under 35 U.S.C. § 284. The parties have agreed that the determination of the amount of damages should be reserved for a later accounting trial. It is altogether proper, accordingly, that a determination on whether those damages should be increased because of willful infringement should also be reserved. Swofford v. B & W, Inc., 336 F.2d 406, 413 (5th Cir. 1964), cert. den. 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965); Patterson-Ballagh Corp. v. Moss, 201 F.2d 403, 408 (9th Cir. 1953); Anchor Hocking Glass Corp. v. White Cap Co., 47 F.Supp. 451, 453 (D.Del. 1942).

### The 956 Patent

#### The Prior Art

U. S. Patent No. 3540956 (the 956 Patent) (PX 34), relates to the manufacture of flat laminated cable, particularly PTFE cable and utilizes a process similar to that of the 292 patent. The 956 patent, however, includes as an additional feature a third roll which cooperates with one of the laminating rolls to form a groove or grooves in one of the tapes. This permits the conductors to

---

10. This Court's colloquy with John Fay is instructive:

THE COURT: When was the first time you ever saw the '292 patent?

THE WITNESS: The first time—I don't remember, but we did get some correspondence out of the file which placed it in the early part of 1970.

THE COURT: You mean when you were getting all these specifications and you were learning that Gore was making something that you were interested in, furnishing it to people that you were trying to furnish the

same material for, you mean to tell me that you didn't bother to look to see whether Gore had any patents which you might be infringing?

THE WITNESS: No, sir, we didn't. (Tr. 644–645).

Moreover, Heller testified that he first became aware of Gore's flat laminated PTFE cable in the market "probably" in the early 1960's and that it occurred to him at that time that the product might be covered by a patent. (Tr. 771–772).

be positioned into the grooves of one tape. This portion of the assembly, consisting of one tape with the conductors positioned therein can be fed along with the second tape to the nip of the laminating rolls. This arrangement allows more precise positioning of the conductors in the cable than is possible using the process of the 292 patent.

Claims 1, 2, 4, 5, 6, 8 and 9 of the 956 patent are relied on by the plaintiff. The prior art principally relied upon by the defendant to support its contention that the process of the 956 patent was obvious are the Midgley (DX 2), Benson (PX 37), Bohanan (PX 39), and the 292 (PX 15) Robert Gore patents.

It has long been recognized in the art of laminating electrical conductors that grooved laminating rollers could be utilized to place a series of electrical conductors in one of two corrugated strips of material and then that the two strips could be united by pressure to embed the wires, see McTighe, U. S. Patent No. 246407 (DX 32); Ackerman, U. S. Patent No. 894,790 (PX 38).

Midgley is a method and apparatus patent for the manufacture of rubber sheets containing fabric cords, such as used in the manufacture of tires. It is similar to the Ackerman patent. (PX 38). Midgley describes a laminating operation in which the cords are encapsulated in rubber sheets. Rubber stock is fed between the two upper calender rolls and between the two lower calender rolls. The calender rolls are heated thus reducing the rubber stock to a rubber sheet on each of the upper and lower calender rolls adjacent to each other. The cords are fed into the upper calender rolls on which the rubber sheet is positioned by means of a grooved guide roll which is mounted so that it rotates and is in contact with the calender roll. The cords are pressed into the upper sheet and the upper and lower sheets are then fed into the nip of the calender rolls so that the cords are laminated between the sheets. The cords are positioned in the upper rubber sheet and held against any lateral slipping by placing the meeting point of the cords and the rubber sheet a sufficient distance along the surface of the upper calender roll from the nip of the two calender rolls to insure a substantial hold by the pressure of the cords against the calender roll as they travel with it and meet the second sheet in the nip of the rolls. The resultant sheets of rubber "become one homogeneous sheet except where the cords are, but the rubber of one sheet surrounds and adheres to all the spaced cords" (DX 2, page 3, lines 59–70; page 4, lines 48–89). In the practice of the invention #10 cords may be fed in parallel relation, as close together as twenty-three to the inch. (Page 4, Lines 2–5).

Benson (PX 37), also relates to the manufacture of tire fabrics and employs essentially the same apparatus as Midgley, but differs in that individual reenforcing wire cables are substituted for individual textile cords. In functional aspects Benson contains rolls identical to the four rolls of the Midgley patent, except three of the rolls are disposed vertically and the fourth roll is disposed horizontally. The rubber stock is fed to the rolls as in the Midgley patent. The stock is shaped by the outermost rolls into sheets or a tape type structure. The wires are precisely aligned by passing them over a grooved pressure roll which presses against the lower of the two calender rolls, thus pressing the wires into the material before the tapes reach the nip of the calender rolls at which point they are encapsulated into the rubber tape. The wires are kept in the grooves of the pressure roll and in the material before the wires are completely encapsulated by tension bars to keep the wires in proper parallel alignment. (Lontz, Tr. 1401, 1402; PX 37, Col. 2, Lines 16–43). This affords a much more critical alignment of the wires than the cords of Midgley. (Tr. 1408).

Both Midgley and Benson tell one skilled in the art that they are disclosing a way in which to align precisely articles embedded in a laminated product. (Tr. 1410).

Bohanan (DX 39), discloses a process and apparatus for laminating elongated members, such as conductors, between layers of thermoplastic materials. Bohanan accurately maintains the lateral spacing of parallel wires or conductors while laminating the wires or conductors between layers of thermoplastic material formed on sheets of thermosetting material. Bohanan points out that heretofore the wire guide mechanism was usually positioned at a distance from the laminating roller and this allowed the wires to shift during advance between the laminating roller. This shifting problem was partially caused by the grooves in the laminating rollers receiving the wires in such a way that they engaged less than 180° of the peripheral surface of the wires thus preventing the coating material from capturing the wires so as to prevent them from moving laterally relative to each other. The Bohanan invention includes a mechanism for supplying a plurality of strands to a first laminating roller which is provided with grooves to support each strand at two tangential points to expose greater than 180° of the peripheral surface of each strand. A pulley rolls on the first laminating roller and is provided with grooves cooperating with the roller grooves to form tunnels for guiding the strands into the roller grooves and thus precludes the shifting of the wires.

In the Bohanan process there are two sets of laminating rollers. The insulating materials are composite tapes of mylar and polyethylene. Both are thermoplastics, but mylar has a higher melting temperature than polyethylene. The tapes are fed with the polyethylene surfaces confronting each other with the wires between to form a composite. In the first set of rollers one of the insulating tapes is heated sufficiently to soften the polyethylene and the wires are embedded in it. The tape with the wires embedded are then fed to the second set of rolls to which the second tape is fed and again the temperature is such that the polyethylene is soft but the mylar is not and the composite is laminated together with the wires between the tapes. (DX 39; Tr. 1412–1417).

In the early sixties the plaintiff had been working with I.B.M. engineers on the development of flat ribbon multiconductor cable suitable for use in transmitting signals between different components of I.B.M. computers. (Tr. 167, 175). By 1964 the plaintiff had developed a cable with a total of 60 conductors which I.B.M. believed was suitable for their use in what later became its 360 computer. The first shipment of cable was made to I.B.M. in the late fall, probably the end of October, 1964. I.B.M. found this cable did not functionally meet the dimensional requirements necessary to make its 360 computer system operate successfully. In late November or December Wilbert Gore met with I.B.M. representatives and was advised of the inadequacies of the cable so far delivered to I.B.M. Wilbert Gore returned to his plant after the meeting and discussed the problem with Howard Arnold, vice president of engineering for Gore. Within two days they successfully met the problem by modifying Gore's existing mechanical apparatus for processing flat PTFE ribbon cable. This was accomplished by passing a tape of PTFE to and through a nip formed by two upper rolls which grooved the tape so that it could take the wires or conductors into the grooves. The grooving of the tapes was accomplished by one of the two rolls having embossed ridges running circumferentially around the roll conforming to the shape of the conductor or wire and the second roll containing recesses which receive the embossments. Thus the tape passing between the embossments and the recesses is pressed by the ridges or embossments to form grooves. The grooves immediately or practically so, receive the conductors, and this assembly is passed to the bight or nip formed by the second of the two upper calender rollers, and the lower of the three rollers upon which is fed a second tape. The conductors are thus encapsulated be-

tween the two tapes in the groove formed in the upper of the two tapes.

This is the method described in the patent. In the manufacture of the cable, however, this method is varied by pre-grooving one of the tapes in which the wires are laid by pressing the wire into the sheet. The wires are bedded into a wire roll which is ridged and this roll is pressed against the upper of two calender rolls so that the wire is pressed into the upper tape just prior to the two tapes meeting at the nip of the calender rolls.

■■■ The Court need not concern itself with whether the second method not indicated or described in the 956 patent is an equivalent since the Court finds that the 956 patent is invalid in view of the prior art. The grooving of calender rolls, wire or cord rolls to press the wires or cords into the material used and the use of tension to achieve a proper alignment is taught in the prior art recited herein. Also the 292 patent discloses that one of the unique properties of PTFE is that wires may be pressed into the PTFE tape or sheet by grooving one of the calender rolls and that PTFE provides a material that under these conditions is not laterally distorted. The Court also is impressed by the fact that Gore was able to keep pace with I.B.M. development of its computer system and within a few days of being called upon to produce a more precise cable was able to do so. Upon examining all of the evidence introduced relative to the 956 patent this Court concludes that it is invalid in view of the prior art and that the method used by Gore and set forth in the 956 patent for producing precise conductor laminated cable was obvious to one skilled in the art.

### Prior Public Use

■■■ The defendant not only urges that the 956 patent is invalid because it is obvious, but also urges that the cable in question covered by the 956 patent was in public use more than one year prior to the filing date of the application for the patent and such a sale is a bar to the issuance of a valid patent under 35 U.S.C. § 102. Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2nd Cir. 1946), cert. den. 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615, rehearing denied 328 U.S. 881, 66 S.Ct. 1364, 90 L.Ed. 1648; Lorenz v. Colgate-Palmolive-Peet Co., 167 F.2d 423 (3rd Cir. 1948). For the sake of completeness, the Court also considers this contention.

The defendant asserts the first sales of products made commercially in accordance with the process of the 956 patent was within two months after a meeting between Wilbert Gore and officials of I.B.M. at Kingston, N.Y. concerning a more precise alignment of the conductors in the cables to meet the requirements of I.B.M. The defendant relies on certain entries made in Wilbert Gore's note book on April 6, 1965 (PX 48) wherein it is stated, "Last July, in connection with I.B.M. order No. EB 411381-455x for 60 conductor cables, Howard Arnold and I were at a loss as to how to maintain the required positioning of conductors by our standard methods of wire guidance." If the meeting occurred in July of 1964, the sale would have occurred more than one year prior to October 6, 1965 the date when the patent application was first filed. Wilbert Gore testified that the date of July referred to in his notes must have referred to the date of the original order. Since the full order number is given in the notes it is quite plausible to believe that the July date referred to the date of the order and not the date of the crucial meeting which must have occurred subsequent to the date of the order. Wilbert Gore further testified that he placed the date of the meeting with the I.B.M. officials at Kingston, N.Y. as November 4, 1964 because of a notation on his desk calendar for that date as follows: "IBM Kingston" (Tr. 396). In order to verify the correct date of the meeting both the plaintiff and defendant enlisted the assistance of I.B.M. Carroll T. Prince, Jr.,

area counsel for I.B.M. who wrote to counsel on or about September 27, 1973 (DX 25) stating that they had located one document which makes reference to a meeting held in Kingston, N.Y. on December 3, 1964, between W. L. Gore Associates, Inc. (represented by Mr. W. Gore) and I.B.M. corporation represented by L. L. Gillett, G. F. McArdle and others. While there is a discrepancy between the date noted in Wilbert Gore's desk calendar and the document referred to by I.B.M. area counsel there is no evidence that there was more than one meeting between Gore and I.B.M. at Kingston in 1964. The Court, therefore, finds as a fact that the meeting relative to the inadequacy of the wire alignment of the cable previously shipped by Gore occurred at Kingston either on November 4, 1964, the date suggested by Gore's desk calendar or on December 3, 1964, the date of the only document found by I.B.M. referring to a conference at Kingston between Gore and I.B.M. Since this meeting did not occur until either November 4, 1964 or December 3, 1964, and the cable manufactured in accordance with the process described in the 956 patent was not shipped until after either of the two dates in question, the patent, if otherwise valid, was not invalid under 35 U.S.C. § 102 by reason of a sale of the cable more than one year prior to the date the application for the patent was filed.

### Antitrust

■ Defendant's antitrust counterclaim relies on alternative theories depending on whether this Court found the patents in suit valid or invalid. In the event the patents were held invalid, defendant alleged fraudulent procurement and enforcement as the grounds for an antitrust violation. In the event the patents were held valid, defendant's counterclaim rested on several theories of patent misuse. This Court has found no fraud in the procurement of the 292 patent, and the defendant has neither alleged nor demonstrated any fraud in the procurement of the 956 patent. There-

fore, defendant's claim of unlawful monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2, based on fraudulent procurement must fail. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The defendant's remaining theories of antitrust violation are based on the facts surrounding the institution and proposed settlement of the present infringement suit.

1. *Factual Background.* The parties have stipulated that the relevant market for the purposes of the antitrust counterclaim is the signal transmission cable market. PTFE flat laminated cable comprises 40–60% of the annual total dollar sales in this market. (Pretrial Order, p. 6). Plaintiff and defendant presently manufacture and sell virtually all of the PTFE flat laminated cable in the United States and transact a substantial amount of interstate commerce annually. Quite predictably, after the defendant first began competing for plaintiff's flat laminated cable business in approximately 1970, plaintiff had to lower its price to meet the competition. In fact, competition from Tensolite was responsible for a reduction in Gore's price for certain flat laminated PTFE cable from $.78 per foot to $.60 per foot. (Tr. 2239–2240; DX 64).

On November 10, 1970, W. L. Gore wrote to the defendant claiming that defendant was infringing the 292 patent and threatening to bring an infringement action. (PX 84). Defendant, after consulting with patent counsel, determined that the patents in suit were invalid, and so informed the plaintiff. Thereafter, plaintiff instituted this action on June 17, 1971. At a meeting held at plaintiff's plant in Newark, Delaware, on July 6, 1972, W. L. Gore and George Hansell, representing plaintiff and George W. Heller, representing defendant, discussed a possible settlement of this litigation. Gore offered a license of the patents in suit to defendant at a royalty of one-half cent per conductor

foot in return for abandoning the suit. The defendant did not accept this offer.

A second settlement meeting between representatives of plaintiff and defendant was held at the Newark plant on September 26, 1972. W. L. Gore proposed the following terms for settlement of this suit:

1. Plaintiff would grant to defendant an exclusive license in the United States under the 292 patent at a royalty rate of 30% on sales;

2. Plaintiff would grant to defendant an exclusive license in the United States under the 956 patent with the royalty rate dropping to 25% or 20% when the 292 patent expires in 1980 and continuing at that rate until the 956 patent expires in 1987;

3. Defendant would reimburse plaintiff in the sum of $15,000 for legal fees incurred in the infringement suit; and

4. Defendant would pay plaintiff a royalty of 30% on all infringing sales made prior to the license. (DX 48).

Gore also discussed all of the possible outcomes for both parties if Tensolite continued its alleged infringement and this action proceeded to judgment. In the course of this discussion, Gore threatened to discontinue the annual purchase by Gore & Associates of between $600,000 and $700,000 worth of conductor wire from International Wire Products Company, another division of the Carlisle Corporation, if the prof-

fered settlement was not accepted. Plaintiff argues that no "threats" were made at the meeting, but defendant took W. L. Gore's remarks to be a threat, (TR. 2166–2167), and given the content of those statements and the context, no other interpretation is plausible.[11]

At the meeting, defendant's representatives took the position that the royalty Gore requested was unreasonably high, and that Tensolite could not afford so high a rate. W. L. Gore responded, in effect, that defendant could afford the royalty by raising its price for PTFE cable back to the level that plaintiff was charging before defendant entered the market. After a period of negotiation, defendant did not accept the proposed settlement and indicated to plaintiff that the proposed license might violate the antitrust laws. Plaintiff interrupted further license negotiations with defendant by a letter dated November 16, 1972, (DX 60), and on January 8, 1973 formally withdrew all prior license offers. (DX 68). Plaintiff did not carry out its threatened refusal to buy conductor wire from defendant's International Wire Products division.

The final significant factual element of the counterclaim is plaintiff's threatened suit against one of defendant's important customers. On August 9, 1972, plaintiff wrote AP Products Incorporated advising of pending action against Tensolite and claiming infringement by AP in selling assemblies incorporating Tensolite cable. (DX 49). In a letter

---

11. W. L. Gore's summary of the meeting written two days later states:

"As background information, we made the following points:

\* \* \* \* \*

2. We are now purchasing between $600,000 and $700,000 per year of conductor, most of which is being supplied by International Wire, a Division of Carlisle. We consider that the operative earnings to the Carlisle Corporation as a consequence of our purchases are being used to finance the patent infringement and litigation costs by Tensolite, therefore, we will seek other suppliers of conductor where the quality, service, and price are approximately the same. We do not wish to con-

tinue to supply funds to Carlisle to finance their infringements of our patents.

\* \* \* \* \*

"We also pointed out to the Tensolite people that the only way they could win would be by agreeing to a license arrangement with us. . . . Further, if Gore shifts its purchases of conductor to competitors of International Wire, Carlisle Corporation will suffer a loss of operative earnings that might amount to several hundred thousand dollars per year." (DX 48).

Surely the statement that a likely cost of continued infringement will be the loss of several hundred thousand dollars worth of business constitutes a "threat".

dated November 17, 1972, plaintiff inquired of AP whether Tensolite had offered to hold AP harmless as a result of any infringement liability incurred through use of Tensolite cable. (DX 52). On February 13, 1973 plaintiff commenced suit in the Northern District of Ohio against AP for infringement of the 292 and 956 patents. (DX 53).

Defendant claims antitrust violation and patent misuse on the following grounds, individually and cumulatively: the royalty sought by plaintiff was unreasonably high; the threatened refusal to buy from a division of defendant was unlawfully coercive; and the threat to sue defendant's customer was made in bad faith with the unlawful intent to stifle competition. These legal claims will be discussed *seriatim*.

■ 2. *The "Unreasonable" Royalty*. Defendant claims that the 30% royalty requested by plaintiff at the September 26 meeting was oppressive, onerous, unreasonable and, therefore, unlawful. It contends that the royalty would generate "unreasonably" high profits—more, assertedly, than Gore would receive if it manufactured and sold the product itself—and would require Tensolite to raise its price for PTFE flat laminated cable to "artificially" high levels. In asserting that Courts should review the royalties charged by patentees for "reasonableness", defendant relies upon United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926). In that case, however, the Court did not intimate that the price a patentee may charge a licensee for his monopoly, as distinguished from other conditions upon the grant of a license, must be reasonable. On the contrary, the Court stated:

Conveying less than title to the patent or part of it, the patentee may grant a license to make, use, and vend articles under the specifications of his patent for *any* royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure. 272 U.S. at 489, 47 S.Ct. at 196. [Emphasis added].

More recently, the Court stated, "A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly." Brulotte v. Thys Co., 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964). To date, there is no support for defendant's position in Supreme Court Decisions.

The only case containing language that a royalty may be so onerous as to constitute an antitrust violation is American Photocopy Equipment Company v. Rovico, Inc., 359 F.2d 745 (7th Cir. 1966). In that case, the Court of Appeals for the Seventh Circuit reversed the granting of a preliminary injunction in a patent infringement suit over the uncontroverted allegations, *inter alia*, that the patentee's licensing program called for an effective royalty of 24% and constituted price fixing. The Court stated:

The record before us shows that the license agreements in effect require plaintiff's licensees to fix a minimum selling price far above the price which they would otherwise charge and that the royalty policy of plaintiff is in violation of the antitrust laws of the United States, being exorbitant and oppressive. 359 F.2d at 747.

To the extent that *American Photocopy* stands for a general proposition that a royalty may be invalid because of its magnitude,[12] this Court declines to follow that opinion. See, Carter-Wallace, Inc. v. United States, 167 U.S.P.Q. 667, 671 (Comm.Op.Ct.Cl.1970), aff'd, 171 U.S.P.Q. 359, 365 (Ct.Cl.1971).

■ Charging what the market will bear is what the patent grant is all about. See Powers, The Patent-Anti-

---

12. On remand, the District Court refused to adopt the position that a royalty may be unlawful because of its magnitude, but nevertheless found that the royalty in that case was not "oppressive". 257 F.Supp. 192 (N.D.Ill.1966). The Court of Appeals affirmed. 384 F.2d 813 (7th Cir. 1967).

trust Balance: Proposals for Change 17 Villanova L.R. 463, 468–469 (1972); Bowman, Patent and Antitrust Law (1973), p. 54. Whether he is dealing with a customer or with a licensee, the rational patentee will set his price so as to maximize his profit. If the patentee sets his price higher than the profit-maximizing level, he will sell less patented product and receive lower profits.[13] Thus, if the 30% royalty demanded by Gore was higher than a profit-maximizing level, the royalty would not generate "unreasonably" high profits, as defendant contends, unless the profits at the profit-maximizing price are themselves "unreasonable". However, the profit-maximizing price is the one traditionally associated with monopoly. See generally, Baxter, Legal Restrictions on Exploitation of the Patent Monopoly: An Economic Analysis, 76 Yale L.J. 267, 358–370 (1966). It cannot be assumed that Congress, in establishing a limited monopoly as the reward for invention, intended a smaller return. Historically, Congress has modified the duration for which the patent grant is conferred but has not sought to qualify the price a patentee may charge. Ibid., 267–275. Nor has defendant suggested how the courts could administer "reasonable" prices short of a profit-maximizing return.[14] In the absence of any price discrimination, which was not possible in the exclusive licensing arrangement here, and in the absence of any attempt

to fix the licensee's prices, which was not proven here,[15] there would seem to be no legal or economic benefit in imposing a restriction on the price the patent monopolist may charge. Baxter, Ibid., supra, 329–339.

As a final matter, defendant has not proven its claim that the 30% royalty would have allowed Gore to earn more for its fiscal year ending March 31, 1973, than it would have made if it manufactured and sold the cable itself. Defendant relies on the testimony of W. L. Gore that plaintiff's net profit from operations in the fiscal year ending March 31, 1973 was "about two-thirds" of 34.1 per cent, or approximately 22.7%. However, there is no evidence in the record about the profitability of PTFE cable, as distinguished from plaintiff's other product lines. (Tr. 38–42).[16] Therefore, this Court has no factual basis for a comparison of the requested royalty and Gore's net profit on cables covered by the patents in suit.

3. *Threat to Discontinue Purchases.* Defendant contends that W. L. Gore's threat at the September 26 meeting to seek other sources than defendant's International Wire Products division for its conductor supplies constituted unlawful reciprocal dealing. Plaintiff contends that at worst, Gore's statement was a unilateral threatened refusal to deal with an infringer and that unilateral refusals to deal are exempt from anti-

---

13. In other words, in economic theory there can be no profits higher than "monopoly profits". If a patentee involved in license negotiations demands a royalty higher than that which would generate monopoly profits, the proper inference may be that he does not wish to grant a license at all.

14. The only principle for price limitation defendant suggests is that "the patentee cannot fix a royalty rate at such an amount that he would receive a profit in excess of that which he would receive if he manufactured and sold the product himself." Defendant's Main Post-Trial Brief, p. 54. This suggested principle is unacceptably broad, for it would condemn to a less than maximum reward the inventor who lacks the capability to produce the product efficiently, or

indeed, at all. There is no intuitive or demonstrated reason for a court to scale the reward for an invention according to the inventor's ability to produce and market it.

15. The observation by W. L. Gore at the September 26 meeting that defendant could "afford" to pay a high royalty if it raised its prices for PTFE flat laminated cable merely stated the obvious. The record discloses no attempt to solicit an agreement by Tensolite to charge higher prices *as a condition for* receiving or retaining the license.

16. Indeed, at oral argument, plaintiff's counsel represented to the Court that although in 1969 90% of Gore's products were based on the 292 and 956 patents, by 1972 only 25% of its products were covered by those patents. (Oral Argument, Tr. 86).

trust liability. Whether characterized as attempted reciprocal dealing or as a threatened refusal to deal, Gore plainly tried to use plaintiff's purchasing power in the conductor wire market to persuade defendant to accept the proposed license of the patents in suit. This Court does not question that the threat was made in the good faith belief that both patents in suit were valid and enforceable and that defendant was a willful infringer.[17] That the 956 patent was subsequently found invalid does not, therefore, affect the outcome of this antitrust claim. See, Bendix Corp. v. Balax, Inc., 471 F.2d 149, 154 (7th Cir. 1972). Thus, the central legal issues are (1) whether plaintiff's threat constituted some form of misconduct, and (2) if so, whether plaintiff is exempt from liability because any market power it could achieve thereby lawfully flowed from the patents in suit in any event.

▮ The Court first considers whether plaintiff's threat constituted an unlawful demand for reciprocity. Reciprocal dealing can take many forms, but it generally involves the use of buying power to secure an advantage in the sale of one's products. ABA, Antitrust Developments, 1955–1968, p. 11. In the present case, plaintiff clearly attempted to use its buying power in the conductor market to obtain several advantages in its sale of PTFE cable: (1) terminating defendant's challenge to the validity of the patents in suit; (2) ending defendant's infringing sales of PTFE cable; and (3) securing a royalty on defendant's sales. In a meaningful sense,

plaintiff contemplated a reciprocal relationship, but whether plaintiff's conduct was unlawful presents several novel questions, and requires, therefore, a rather extended analysis.

The Supreme Court first recognized the anticompetitive effects of reciprocal dealing in FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L. Ed.2d 95 (1965), which held that § 7 of the Clayton Act, 15 U.S.C. § 18, is violated when a merger creates the probability of reciprocal dealing. The Court held that reciprocity is "one of the congeries of anticompetitive practices at which the antitrust laws are aimed" because it results in " 'an irrelevant and alien factor' . . . intruding into the choice among competing products, creating at the least 'a priority on the business at equal prices.' " 380 U.S. at 594, 85 S.Ct. at 1222 [citations omitted]. In so finding, the Supreme Court took a position similar to that already adopted in this Circuit: "[Reciprocity] is particularly destructive of competition because it transforms substantial buying power into a weapon for 'denying competitors less favorably situated access to the market.' United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 92 L.Ed. 1236 (1949)." United States v. Ingersoll Rand Company, 218 F.Supp. 530, 552 (W.D.Pa.1963), aff'd, 320 F.2d 509 (3rd Cir. 1963).

▮ It is true, as plaintiff contends, that the doctrine of reciprocity has generally been considered in determining the legality of corporate mergers under Clayton Act § 7.[18] See, e. g., FTC

---

17. A patentee's use of purchasing power in another market as a bargaining tool in settlement negotiations in an infringement suit could create an inference that the patentee, as well as the infringer, seriously doubted the validity of the patent. Otherwise, a patentee might be content to rely on the validity and value of the patent together with concessions on the terms of a license as bargaining tools. However, the record as a whole in this case convincingly demonstrates that plaintiff, with ample cause, considered that his patents were valid, taking account of the "appreciable" possibility that any patent tested in court may be held invalid.

18. Clayton Act § 7, 15 U.S.C. § 18, provides in part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

v. Consolidated Foods, supra; United States v. Ingersoll-Rand Company, supra; Allis-Chalmers Manufacturing Company v. White Consolidated Industries, Inc., 414 F.2d 506 (3rd Cir. 1969); United States v. International Telephone & Telegraph Corporation, 306 F.Supp. 766 (D.Conn.1969), appeal dismissed, 404 U.S. 801, 92 S.Ct. 20, 30 L.Ed.2d 34 (1971). However, this Court has no difficulty in concluding that if corporate mergers can be unlawful under Clayton Act § 7 because of the *potential* they create for reciprocal dealing, the actual practice of reciprocity can also violate the antitrust laws. Thus, a contract, combination, or conspiracy to engage in reciprocal dealing can restrain trade in violation of Sherman Act § 1.[19] Two courts have already adopted this position. Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3 (4th Cir. 1971); United States v. General Dynamics Corp., 258 F.Supp. 36 (S.D.N.Y.1966). Similarly, although this Court has found no cases so holding, use of reciprocity to monopolize or to attempt to monopolize interstate commerce can, upon a proper factual showing, violate Sherman Act § 2.[20] What is prohibited is the use of buying power in one market to cause an injury to competition in another market.

 Having determined that the practice of reciprocity can violate both § 1 and § 2 of the Sherman Act, this Court notes that under the facts of the present case, plaintiff cannot have violated Sherman § 1. The facts of this case show only a unilateral threat by Gore not to buy from defendant's subsidiary unless defendant came to terms in the present litigation. The defendant did not acquiesce in plaintiff's demands, nor did plaintiff enlist the assistance of others in a campaign to force defendant to accept a license. Thus there was here no colorable contract, combination, or conspiracy, express or implied, and the "collaborative element" of Sherman § 1, has not been proven. Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965). Therefore, this Court may confine its inquiry to whether plaintiff's threatened refusal to purchase, never carried out, constitutes unlawful conduct under Sherman § 2.

 Defendant does not contend that plaintiff has actually monopolized the signal transmission cable market, but rather asserts that plaintiff has unlawfully attempted to monopolize the market. To make out a case of attempted monopolization under Sherman § 2, defendant must show that plaintiff specifically intended to monopolize the relevant market through the use of unfair methods of competition, Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), and that there was a "dangerous probability" of success, *Lorain Journal*, supra, 342 U.S. at 153, 72 S.Ct. 181.[21]

19. Sherman Act § 1, 15 U.S.C. § 1, provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

20. Sherman Act § 2 provides in pertinent part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor. . . .

21. Although all courts agree that specific intent is a necessary element of an attempted monopolization claim, the circuits differ over whether a dangerous probability of market dominance must be shown. Note, Attempt to Monopolize under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case, 73 Col.L.R. 1451 (1973). However, the "dangerous probability" requirement seems to have been adopted in several district courts in this Circuit. Keco Industries, Inc. v. Borg-Warner Corp., 334 F.Supp. 1240, 1245 (M.D.Pa.1971); Power Replacements Corp. v. Air Preheater Co., 356 F.Supp. 872, 891 (E.D.Pa.1973). But see Mt. Lebanon Motors, Inc. v. Chrysler Corporation, 283 F.Supp. 453 (W.D.Pa. 1968), aff'd 417 F.2d 622 (3rd Cir. 1969).

■ The required specific intent need not be proven by direct evidence but can be inferred from practices of the defendant. United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). In this case there is no real question that plaintiff intended to obtain control over all PTFE flat laminated cable. An analysis of the proposed Tensolite license prepared by plaintiff's staff shortly before the September 26 settlement meeting defines the "market" as signal transmission cables and states that the "PTFE market", with sales of approximately one million dollars annually, represents 60% of that "market". (DX 47). Not only was plaintiff aware of the size of the market at stake, but the content of the licensing proposal made on September 26, (DX 48), demonstrates that plaintiff intended to exercise the exclusionary power of the patents in suit to their fullest extent. Thus, specific intent has been adequately proven.

■ This Court also concludes that there was substantial probability that Gore's threat would allow it to dominate the 40–60% market share attributable to PTFE flat laminated cable. Although no evidence has been presented showing the size and shape of the relevant market for conductor wire and plaintiff's share of the annual purchases therein,[22] by its own admission, plaintiff confronted defendant with the loss of "operative earnings that might amount to several hundred thousand dollars per year." (DX 48). That risk was substantial enough to affect the judgment of a reasonable businessman and thereby to increase the likelihood that plaintiff would dominate the preponderance of the relevant market. The magnitude of this threat is evident when contrasted with the dollar volume of defendant's PTFE cable sales, some $108,000 in 1972, according to George Heller. (TR. 2175).

■ The difficult legal question is whether this substantial probability of market domination was at all "dangerous", or to put it another way, whether plaintiff's attempt to enforce its patent can accurately be called an unfair method of competition. To be sure, since the 292 patent has been found valid and since the 956 patent was presumptively valid, 35 U.S.C. § 282, and was not procured by fraud, plaintiff was entitled to seek the full market share attributable to the patents in suit. Accordingly, the attempted reciprocity, if successful, would not have gained for plaintiff an unlawful monopoly in the signal transmission market. However, even in cases where market domination itself does not offend the antitrust laws, the conduct producing that domination may constitute an antitrust violation. In Union Leader Corp. v. Newspapers of New England, Inc., 284 F.2d 582 (1st Cir. 1960), for example, the court found an unfair practice in violation of Sherman § 2 even though the relevant market was a "natural monopoly" which could only support one of the two competing firms.

■ The use of reciprocity by a patentee to secure settlement of an alleged infringer's invalidity counterclaim can have adverse effects on competition. The alleged infringer may accept a license and abandon its challenge to validity, not simply based on its assessment of patent validity, but also to avoid losing sales in another market. To the extent that this altered judgment preserves invalid patents, resources are misallocated and consumers suffer. Compare, Hausman, Reciprocal Dealing and the Antitrust Laws, 77 Harv.L.R. 873 (1964). Furthermore, the existence of an unchallenged patent may deter others from attempting to compete with the licensor and licensee. Lear, Inc. v. Adkins, 395 U.S. 653, 669, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Several observations made by the Supreme Court in

22. Of course, if plaintiff had "monopoly" power—a buyer's monopoly—in the relevant conductor market, use of that power to persuade defendant to accept a license in the signal transmission cable market would alone have constituted a § 2 violation, without any showing of specific intent or dangerous probability. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

discussing the public policies involved in the doctrine of licensee estoppel to challenge patent validity are pertinent here:

> A patent, in the last analysis, simply represents a legal conclusion reached by the Patent Office. Moreover, the legal conclusion is predicated on factors as to which reasonable men can differ widely. Yet the Patent Office is often obliged to reach its decision in an *ex parte* proceeding, without the aid of the arguments which could be advanced by parties interested in proving patent invalidity. . . .
>
> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. Lear, Inc. v. Adkins, supra, at 670, 89 S.Ct. at 1911.[23]

If the public interest is ill-served by allowing licensees to contract away their opportunity to challenge patent validity as was the case before *Lear,* it is equally ill-served by allowing patentees to stifle challenges to patent validity by the use of purchasing power in a separate market. Had plaintiff's threat been successful, the public would needlessly, in the view of this Court, have been burdened with the 956 patent. If there can be any special circumstances justifying the use of reciprocity, plaintiff has not shown them here. Accordingly, this Court finds that plaintiff's threatened reciprocity constitutes attempted monopolization in violation of Sherman § 2.

Plaintiff's contention that its threatened refusal to purchase from defendant's subsidiary is exempt from antitrust liability under the holding of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) is without merit. In *Colgate,* the Supreme Court upheld the right of a manufacturer to refuse to sell to customers who would not maintain specified retail prices. The scope of this exemption of "unilateral" refusals to deal from antitrust liability has been substantially restricted by later decisions. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). *Colgate* and its progeny focused on whether assertedly unilateral conduct was sufficiently concerted to fall within Sherman § 1's proscription of contracts, combinations, or conspiracies in restraint of trade. None of these cases intimate any exemption of unilateral conduct constituting monopolization or attempted monopolization from liability under Sherman § 2. Indeed, the *Colgate* doctrine is inapplicable by its own terms to the present case:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of the trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal. 250 U.S. at 307, 39 S.Ct. at 468. [Emphasis added].

See also, Lorain Journal Co. v. United States, supra, 342 U.S. at 155, 72 S.Ct. 181, 96 L.Ed. 162; Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3rd Cir. 1962).

---

23. Similarly, Justice Rehnquist, dissenting in United States v. Glaxo Group Ltd., 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973), recently pointed out, "Certainly, it is true, as the Court states, that there is a public interest favoring the judicial testing of patent validity and the invalidation of specious patents." 410 U.S. at 69, 93 S.Ct. at 871.

For the same reasons that it finds plaintiff's attempted reciprocity to violate the Sherman Act, the Court finds that plaintiff's conduct constitutes patent misuse. Morton Salt Co. v. Suppiger, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Nordhaus & Jurow, Patent-Antitrust Law (1972 ed.), pp. 138–141.

Plaintiff and defendant agree, and the Court has concurred, that the determination of the amount of damages on the counterclaim, as on the infringement claim, should be reserved for a later accounting trial. However, a few preliminary observations are in order. Plaintiff's unlawful conduct began with the threat made on September 26, 1972 and ended no later than January 8, 1973, when all pending license offers were withdrawn. (DX 68). Plaintiff did not carry out its threatened refusal to deal with International Wire Products, nor did defendant accede to plaintiff's demands. This lawsuit proceeded apace, and defendant has paid no royalties to plaintiff. Thus, it is unlikely that defendant can establish more than minimal damages on its antitrust counterclaim. See 15 U.S.C. § 15.

 The considerations for remedying the patent misuse here are somewhat different. A finding that a patent owner has misused its patent does not operate to invalidate the patent, and full rights to enforce a patent that has been misused may be reinstated when it can be shown "that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated." Morton Salt Co. v. Suppiger, supra, at 492–493, 62 S.Ct. at 405. Plainly, plaintiff abandoned its improper practice by January 8, 1973. In devising a remedy for patent misuse, a court should take pains neither to reward the plaintiff for its misuse nor to put a premium on the defendant's wrongdoing. "In short, the decree should, if at all possible, be so drawn as to protect the public from the continuing wrong doing of the plaintiff in mis-

using its patents and the plaintiff and the public from the continuing wrong doing of defendant in deliberately pirating plaintiff's invention." Gray Tool Co. v. Humble Oil & Refining Co., 186 F.2d 365, 370 (5th Cir. 1951). Consequently, this Court will deny to plaintiff any recovery for defendant's infringement during the period when plaintiff's threat was outstanding, September 26, 1972–January 8, 1973. Any greater restriction on plaintiff's recovery would unduly reward defendant for what is at heart an injury to the public. A lesser restraint on plaintiff's recovery might fail to deter those who would engage in the type of misuse proven here.

 4. *Threat to Sue Defendant's Customer.* This Court finds no misconduct in plaintiff's communications with AP Products, Incorporated, a principal customer of defendant. There is no evidence that this notification of plaintiff's patent rights was made in bad faith, nor has defendant shown any misconduct in plaintiff's inquiry concerning the existence of an indemnity agreement between defendant and AP. On the facts outlined earlier, defendant, in this regard, had demonstrated no more than lawful enforcement of plaintiff's patent rights. 35 U.S.C. § 271(d)(3).

### Conclusion

In summary, this Court has concluded that the 292 patent is valid and infringed, that the 956 patent is invalid, that plaintiff has committed an antitrust violation and a patent misuse. Plaintiff is entitled to an injunction prohibiting further infringement of the 292 patent and an accounting to ascertain the damages for defendant's infringement of that patent. However, no damages may be recovered by plaintiff for defendant's infringement during the period of plaintiff's patent misuse. Defendant is entitled to damages and attorneys fees attributable to plaintiff's antitrust violation.

Submit order.